UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ILLINOIS NATIONAL INSURANCE
COMPANY, an Illinois corporation,

      Plaintiff,

V.

ALIXPARTNERS LLP, a Michigan limited
liability partnership,

      Defendant.

Case No.

Hon.

_____/

## COMPLAINT

Plaintiff, Illinois National Insurance Company ("Illinois National") sues Defendant, AlixPartners LLP ("Alix") for recoupment of defense expenses and settlement funds advanced to Alix and for reformation of its insurance policy with Alix.  In support, Illinois National states:

### INTRODUCTION

1.      The basis for this Complaint is the payment by Illinois National on behalf of its insured, Alix, of over $19 million[1] in connection with a claim brought by Kingsbridge Capital Management GP Limited ("Kingsbridge").  Illinois National made the payment while reserving all of its rights, including the right to recoup any payments made.

2.      The claim was first made in writing against Kingsbridge on March 7, 2008, but it was not reported to Illinois National as required under Alix's then-current policy with Illinois National (hereinafter, "Policy 1").  On March 7, 2008, Alix received a written settlement demand for money from Kingsbridge in an attempt to resolve a dispute with Kingsbridge (hereinafter, the

---

[1] The policy limit was $20,000,000. Approximately $900,000 was paid on an unrelated claim.

"Claim.").  This written demand for money constituted a Claim under Alix's policy with Illinois National.

3.       Alix did not report the Claim to Illinois National as required for coverage under Policy 1.

4.       Despite its knowledge of the Claim, Alix continued to negotiate a policy renewal with Illinois National, including negotiations to remove certain exclusions from the policy which were included in Policy 1.  Alix did not disclose any information regarding its dispute with Kingsbridge during the renewal process.

5.       Unaware of the existence of the Claim, Illinois National agreed to remove an "Investment Advisor" exclusion from the renewed policy (hereinafter, "Policy 2") that would have barred coverage for the Claim.  Subsequently, Alix also obtained an endorsement amending a securities exclusion (the "Securities Exclusion") which would likewise have barred the Claim.

6.       The dispute between Alix and Kingsbridge lingered for months.  Kingsbridge continued to reassert its Claim against Alix and the dispute was reported in the press in Germany.  On July 22, 2009, Kingsbridge served a draft arbitration complaint against Alix which reasserted the Claim (hereinafter, the "Arbitration").

7.       On August 14, 2009—over seventeen months after the Claim was first made— Alix first reported the Claim to Illinois National by forwarding the draft arbitration complaint. Although Policy 2 had expired, the policy included an Automatic Extended Reporting Period (hereinafter, the "Extended Reporting Period").  However, the Extended Reporting Period only provided coverage for claims *first made* during the Extended Reporting Period.

8.       Illinois National was unaware that the Claim had been first made during the policy period for Policy 1.  Because Illinois National was led to believe the Claim was first made

during the Extended Reporting Period for Policy 2, it paid for Alix's defense of the Arbitration under Policy 2.

9.      In October 2011, the arbitration panel issued a decision against Alix for roughly $17,000,000 (or €13,080,362), plus substantial pre-judgment interest.

10.     Following the decision, Alix made several motions to the arbitration panel and filed an appeal.

11.     On January 4, 2013, Alix disclosed documents to Illinois National which finally revealed that the Claim was first made on March 7, 2008.

12.     On January 31, 2013, Illinois National agreed to fund the $18.5 million settlement of the Arbitration, but reserved its right to recoup defense costs and settlement funds.  Illinois National now seeks to assert those rights.

13.     Because the Claim was first made during the policy period for Policy 1 but not reported during the policy period for Policy 1, it is not covered under Policy 1.  Moreover, had the Claim been timely reported under Policy 1, the exclusions in that policy would have precluded coverage.

14.     Even if the March 7, 2008 written demand is not considered the first assertion of the Claim (which it was), Kingsbridge continued to assert the Claim during the policy period for Policy 2.  Alix did not report the Claim until after Policy 2 expired and during the Extended Reporting Period.   However, the Extended Reporting Period only applies to claims first made during the Extended Reporting Period.  Because the Claim was not first made during the Extended Reporting Period, the Claim is not covered under Policy 2.  Accordingly, Illinois National is entitled to recoupment of $19.1 million in uncovered settlement and defense costs.

15.     In the alternative, Illinois National seeks to reform Policy 2 based on Alix's inequitable conduct during the application, issuance and May 2008 amendment of Policy 2.  As set forth more fully below, Alix failed to disclose any information regarding the dispute with Kingsbridge, including the existence of the Claim.  This enabled Alix to obtain favorable modifications to the renewed policy which created potential coverage for the previously excluded Claim.

### JURISDICTION, VENUE, AND PARTIES

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17.     Illinois National is an Illinois corporation with its principal place of business in New York, New York.

18.     Alix is a Michigan limited liability partnership with its principal place of business in Southfield, Michigan.

19.     This Court has personal jurisdiction over Alix because its principal place of business is within this District.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Alix resides within this District and is subject to personal jurisdiction in this District.

### ILLINOIS NATIONAL ISSUES THE 2006-2008 POLICY TO ALIX

21.     Policy 1 is a Miscellaneous Professional Liability Policy Illinois National issued to Alix for the period of October 12, 2006 to March 15, 2008 with the aggregate limit of liability of $20 million.  A copy of Policy 1 is attached as **Exhibit A**.

22.     Policy 1 states:

4

> Notice: This is a Claims Made Policy.  Except to such extent as may otherwise be provided herein, the coverage of this policy is limited to liability for only those claims that are first made against [Alix] and reported in writing to [Illinois National] during the Policy Period.

Exhibit A at p. 1 (capitalization omitted).

## ALIX AND KINGSBRIDGE BEGIN THEIR DISPUTE AND KINGSBRIDGE MAKES VERBAL DEMANDS

23.     While Policy 1 was in effect, Alix entered into a contractual relationship with an investment firm known as Kingsbridge.[2]

24.     Kingsbridge is a European private equity company which specializes in restructuring projects.

25.     Kingsbridge engaged Alix to perform due diligence in connection with Kingsbridge's proposed acquisition of a German model railway manufacturer known as Märklin. Alix's duties also included preparing an investment case and developing a plan for the restructuring of the company.

26.     Some of the core tasks within the scope of Alix's due diligence were analyzing Märklin's production capabilities, identifying potential savings and evaluating the market for Märklin's products.

27.      In May 2006, allegedly based on its reliance on Alix's advice, Kingsbridge acquired Märklin.

28.     Kingsbridge's investment in Märklin took a turn for the worse during the second half of 2007.

---

[2] In this Complaint, "Kingsbridge" collectively refers to the underlying claimant Kingsbridge Capital Management GP2 Limited and its predecessor-in-interest, Kingsbridge Capital Management GP Limited.

5

29.     As Alix later admitted in the Arbitration proceeding, on December 19, 2007, Kingsbridge's nominee on Märklin's advisory board "raised serious accusations against the representatives of [Alix] and requested them to return part of their consulting fees." *See* Alix's Answer to Arbitration Complaint, an excerpt of which is attached hereto as **Exhibit B**.

30.     Accordingly, Alix was fully aware that Kingsbridge was seeking monetary damages as early as December 2007.  This verbal demand was not disclosed to Illinois National.

## KINGSBRIDGE MAKES THE CLAIM AGAINST ALIX

31.     Just two and half months later, Kingsbridge made a written demand for money against Alix.  On March 7, 2008, Kingsbridge's designee on Märklin's advisory board (Michel Perraudin) wrote a letter to Alix, an English translation of which is attached as **Exhibit C** (hereinafter, the "March 7, 2008 Letter").  Upon information and belief this was the first assertion of the Claim.

32.     The March 7, 2008 Letter aired the grievances of both Kingsbridge (as investor) and Märklin (as the restructured company).  However, it was clear that it was the concerns of Kingsbridge regarding Alix's investment advice that were central to the Claim.

33.     Kingsbridge reiterated the fears it had orally communicated to Alix in December 2007: Kingsbridge's investment in Märklin had not lived up to the investment advice presented by Alix.

34.     Perraudin began the letter by stating that "[w]ith preliminary approval of Märklin's 2007 annual financial statements, our fears have unfortunately been confirmed." *See* Exhibit C at p.1.

35.     Perraudin noted that Märklin's Earnings Before Interest, Taxes Depreciation and Amortization (EBITDA) were "€5.8 million lower than in the investment case presented by

[Alix]" and that the "debt level of "€69 million is more than €25 million higher than planned."
*Id*.

36.     Perraudin explained the significance of these figures:

> This means the Kingsbridge and Goldman Sachs investment has
> suffered a significant loss in value, and an exit in the near term
> hardly seems possible.

37.     The "exit" from the investment expressed in the letter was clearly a concern for
Kingsbridge, not Märklin.

38.     After describing the alleged damage to Kingsbridge, Perraudin shifted his focus to
Alix:

> Was Alix Partners too optimistic in its planning and were the plans
> unachievable? Was the implementation too timid and poorly
> managed? How did this happen? Who is at fault?

39.     The letter leaves no doubt that the blame is put squarely on Alix's investment
advice.  Because Alix "*conducted the commercial due diligence, put together the investment
case*, defined the restructuring program and played an advisory role in its implementation, and
who furthermore filled the key positions of CEO, CFO, and CRO as managing directors or
general managers over an extended period," Perraudin stated that the consultants at Alix
"certainly bear a very substantial share of the fault."  *Id*. (emphasis added).

40.     The letter makes a pre-litigation demand.  It states that "[i]n the interests of
avoiding a protracted conflict that would prove time-consuming and detrimental to all parties, we
would appreciate it if AlixPartners would voluntarily waive a portion of its remuneration and
success fees for 2006/2007 and its capital gain participation."  *See* Exhibit C at p. 2.

41.     The capital gain participation demanded by Perraudin had been contingent upon a
"successful exit" for Kingsbridge.  This successful exit was the sole concern of Kingsbridge, not
Märklin.

42.     Overall, this proposal demanded from Alix €3 million in consulting fees that had already been paid, €1.1 million in already-paid success fees, and approximately €2.2 million in success fees that had yet to be paid for a total of approximately €6 million. *Id.*

43.     The letter concludes by clarifying that it was making a settlement demand and saying "[w]e hope you will accept this proposal." *Id.*

44.     Upon information and belief, the March 7, 2008 Letter was the first time Kingsbridge asserted the Claim.[3] It was a written demand for money arising out of Alix's alleged failures in preparing the investment case and performing due diligence. It demanded fees, such as fees contingent on Kingsbridge's successful exit, which were clearly related to Kingsbridge's investment and Alix's role in advising Kingsbridge to make the investment.

45.     Negotiations between the parties continued. On April 21, 2008, Alix responded to the March 7, 2008 Letter and noted that "[a]s it is our intention to finally resolve this situation, I had indicated to you that we would gladly discuss our agreements with [Kingsbridge]." An English translation of the April 21, 2008 letter is attached as **Exhibit D**.

46.     Just two days later, in a letter dated April 23, 2008, Kingsbridge responded by stating that Alix "based on its own commercial due diligence, has built up a mid-term planning and an investment case which is clearly unrealistic." Perraudin reasserted the Claim and made clear that he was speaking for the aggrieved investors. According to Perraudin, the shareholders "had to write off part of their investment and to provide an unplanned additional financing of approximately €20 million, to which another €10 million will have to be added" while Alix "has already cashed in close to € 7 million." An English translation of the April 23, 2008 letter is attached as **Exhibit E**.

---

[3] Illinois National reserves the right after discovery to amend the Complaint if it finds that Kingsbridge had made other earlier written demands.

### ALIX NEGOTIATES FOR A RENEWAL OF THE POLICY

47.     Even as Kingsbridge and Märklin were making verbal and written demands, Alix continued its negotiation with Illinois National for a renewal of its professional liability coverage under Policy 1.

48.     Alix did not disclose the Claim or provide any notice of the dispute with Kingsbridge to Illinois National at any point during the renewal negotiations.

49.     The Miscellaneous Professional Liability Renewal Application (the "Application") noted that: "[a]ny person who knowingly and with intent to defraud any insurance company…files an application for insurance…[that] conceals, for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent act, which is a crime and subjects such person to criminal and civil penalties. " *See* Application, a copy of which is attached as **Exhibit F** (capitalization omitted).

50.     Alix knew that the information regarding the Claim was material, but knowingly omitted that information from the Application.

51.     Illinois National agreed to renew Alix's policy and issued Policy 2, a Miscellaneous Professional Liability Policy to Alix for the period of March 15, 2008 to June 30, 2009 with the aggregate limit of liability of $20 million. A copy of Policy 2 is attached as **Exhibit G**.

52.     Policy 2, like Policy 1, is a "claims made" insurance policy.  The policy provides coverage for "damages resulting from a claim *first made* against [Alix] and *reported to* [Illinois National] during the Policy Period or Extended Reporting Period…for [Alix's alleged] wrongful act in rendering or failing to render professional services for others." *See* Exhibit F, § I.A, Insuring Agreement (emphasis added).

9

53.     Endorsement #16 of Policy 2 defines "Claim" as "a written demand for money or services, including a suit, arising from [Alix's] wrongful act." *Id*.

54.     Policy 2 defines "Wrongful act" as "any actual or alleged negligent act, error or omission, misstatement or misleading statement committed solely in [Alix's] performance of [management consulting and/or advisory services]…" *Id*., II.Q and Endorsement #1.

55.     Policy 1 had contained a specific exclusion for claims arising from "investment advice."  (the "Investment Advisor Exclusion")  *See* Exhibit A at Endorsement #16. This exclusion provided that Illinois National would not cover claims arising out of, among other things:

> IA-C.   **an insured providing investment advice**, or selecting an investment manager, investment advisory or custodial firm;

*Id*. (emphasis added).

56.     In Policy 2, Alix obtained removal of the Investment Advisor Exclusion.  *See* Exhibit F.  Without the removal of the Investment Advisor Exclusion, the Claim against Alix would clearly have been excluded from coverage.

57.     Further, on or about May 6, 2008 — nearly two months after the Claim was first made and at least five months after Alix became aware of Kingsbridge's demands— Alix sought and obtained a modification to the Securities Exclusion.

58.     Policy 2 originally excluded any claim arising out of "the purchase, sale, or offer or solicitation of an offer to purchase or sell securities."  Exhibit F at Exclusion III.D. Alix— with full knowledge of the ongoing dispute over Kingsbridge's purchase of Märklin's shares— obtained an endorsement in May 2008 that limited this exclusion to "any purchase, sale or offer

or solicitation of an offer to purchase or sell **[Alix's]** securities."  *See* Exhibit F at Endorsement #25 (emphasis added).

59.     The Claim made by Kingsbridge in the March 7, 2008 Letter was based on Kingsbridge's dissatisfaction with Alix's investment advice to Kingsbridge which led to its purchase of Märklin's securities.

60.     Absent the amendment obtained by Alix while it knew of the Claim, the Security Exclusion would have barred coverage for the Claim.

61.     Illinois National had no knowledge of the Claim when it agreed to the modifications to coverage.

## KINGSBRIDGE TAKES DISPUTE TO PRESS AND MAKES ADDITIONAL DEMANDS DURING POLICY 2

62.     Upon information and belief, after the March 7, 2008 Letter and during the period covered by Policy 2, Kingsbridge continued to make demands against Alix based on Alix's negligent due diligence and preparation of an investment case for the acquisition of Märklin.

63.     These demands were not reported or disclosed to Illinois National.

64.     On March 2, 2009, a Kingsbridge representative reasserted the allegations of the Claim to the German web site Spiegel Online.  He said Kingsbridge was "not satisfied with the service" and that the "state of Märklin in 2006 was much worse than was portrayed to us."  An English translation of the March 2, 2009 article is attached as **Exhibit H**.

## ALIX CHOOSES NOT TO RENEW THE POLICY

65.     On June 30, 2009, Alix elected not to renew its policy with Illinois National.  Alix had still not reported the Claim.

66.     However, Endorsement #9 to Policy 2 provided for a period of sixty (60) days in which Alix could give notice to Illinois National of "claims *first made* against [Alix] *during* the Automatic Extended Reporting Period." See Exhibit F at Endorsement #9 (emphasis added).

67.     Accordingly, the Extended Reporting Period did not apply to any claim that had been first made prior to the expiration of Policy 2.

68.     The claim had been first made prior to the existence of Policy 2, and not during the Extended Reporting Period.   Thus, the Claim was clearly not covered during the Extended Reporting Period.

### KINGSBRIDGE REASSERTS THE CLAIM BY DEMANDING ARBITRATION

69.     On July 22, 2009, Kingsbridge's counsel delivered a draft arbitration complaint to Alix's counsel (hereinafter, the "Draft Complaint.")  A copy of the Draft Complaint is attached as **Exhibit I**.

70.      The Draft Complaint merely reiterated the Claim first made in the March 7, 2008 Letter. Namely, the Draft Complaint contained causes of action for breach of contract, breach of fiduciary duty and gross negligence in Alix's performance of due diligence and preparation of an investment case for Kingsbridge's proposed investment in Märklin.

71.     Kingsbridge had already made the Claim contained in the Draft Complaint during the period for Policy 1.  In Perraudin's March 7, 2008 Letter, Kingsbridge demanded millions of Euros in fees for, among other things, Alix's role in "conduct[ing] the commercial due diligence" and "put[ting] together the investment case" for the failed investment in Märklin.  *See* Exhibit C.

72.     The allegations about Alix's negligence in due diligence and preparing the investment case contained  in the Draft Complaint were a mere repetition of the allegations made

in the March 7, 2008 Letter.  Thus, the claim made in the Draft Complaint was the same Claim first made during Policy 1.

73.    However, as discussed above, Alix never reported the Claim made in the March 7, 2008 Letter to Illinois National.

### ALIX REPORTS THE CLAIM DURING THE EXTENDED REPORTING PERIOD

74.    On August 14, 2009, Alix's broker Marsh reported the existence of the Draft Complaint to Illinois National.

75.    Policy 2 had expired on June 30, 2009.  However, Alix stated that it was reporting the Draft Complaint pursuant to Policy 2's sixty-day Extended Reporting Period for "claims first made against [Alix] during the Automatic Extended Reporting Period."  *See* Exhibit F at Endorsement #9 (bolding omitted).

76.    The Claim was not first made during the Extended Reporting Period and therefore could not have been properly reported on August 14, 2009.

77.    As set forth above, the Claim was first made against Alix, at the latest, on March 7, 2008.  Further, Kingsbridge continued to assert the Claim during Policy 2 but *before* the Extended Reporting Period.  Therefore, the Draft Complaint was not a claim "first made against [Alix] during the Automatic Extended Reporting Period" and could not be reported under Policy 2 on August 14, 2009.

78.    Nonetheless, Illinois National remained unaware of the prior assertions of the Claim that Alix never reported to Illinois National.

13

### ILLINOIS NATIONAL RESERVES ITS RIGHTS AND REQUESTS INFORMATION

79.     On September 9, 2009, Illinois National sent a letter to Alix reserving its rights regarding, among other things, "whether the delivery of the Draft Complaint to Alix is the first time the claim contained in the Draft Complaint was made."

80.     In order to assist with this determination, Illinois National requested a copy of a November 14, 2008 letter from Kingsbridge's counsel to Alix and all other written communications between Alix and Kingsbridge with respect to the Claim.   A copy of the September 9, 2009 Letter is attached as **Exhibit J**.

81.     Alix failed to provide Illinois National with a copy of the November 14, 2008 letter.

82.     Under the Extended Reporting Period of Policy 2, Illinois National was not obligated to provide coverage unless a claim was not covered under any subsequent insurance purchased by Alix.

83.     On August 10, 2010—after being notified that Alix's subsequent insurer denied coverage of the claim made in the Draft Complaint—Illinois National sent a letter finding there was potential coverage for the Draft Complaint under Policy 2 subject to a reservation of rights. This reservation incorporated all rights reserved in Illinois National's September 2009 letter, including its right to investigate whether the delivery of the Draft Complaint to Alix was the first time the Claim contained in the Draft Complaint was made.   A copy of the August 10, 2010 Letter is attached as **Exhibit K**.

84.     Illinois National further noted that it had "not yet received the November 2008 letter from [Kingsbridge's counsel] we requested in the [September 9, 2009 Letter].   We renew our request for a copy of that letter translated into English."

14

85.     Subject to the reservation of rights, Illinois National advanced Alix's defense costs in the Arbitration pursuant to Policy 2.

### THE ARBITRATION PANEL RULES IN FAVOR OF KINGSBRIDGE AND ILLINOIS NATIONAL DISCOVERS THAT CLAIM HAD BEEN MADE UNDER POLICY 1

86.     Illinois National encouraged Alix to reach out to Kingsbridge's counsel regarding settlement on May 10, 2011.  Alix resisted based on, among other things, its concerns about negative publicity.

87.     In October 2011, the arbitration panel issued a decision in favor of Kingsbridge for damages in the amount of €13,080,362, plus significant pre-judgment interest.

88.     As settlement discussions continued, Illinois National had still never received the November 2008 letter it had demanded from Alix almost a year earlier.  Illinois National again asked Alix for the letter, which it finally received on December 7, 2012.  The November 2008 letter identified a "Kingsbridge v. Alix" dispute and referenced prior communications about Alix's failures in due diligence.  An English translation of the November 2008 letter is attached as **Exhibit L**.

89.     Illinois National continued to investigate the Claim until, on January 4, 2013, Alix finally provided copies of the March 7, 2008 Letter and other communications which revealed that the Claim had been first made during the policy period for Policy 1.

90.     Because the Claim was first made during the period covered by Policy 1 and not reported until the Extended Reporting Period for Policy 2, it was not covered under either of the policies.[4]

---

[4] Illinois National further notes that the Claim would not be covered under Policy 1 due to the existence of the Investment Advisor exclusion and the Securities Exclusion.  See Exhibit A at III.D and Endorsement #16.

15

## THE PARTIES SETTLE AND ILLINOIS NATIONAL
## FUNDS THE SETTLEMENT SUBJECT TO A RESERVATION OF RIGHTS

91.     Illinois National promptly alerted Alix to the coverage issues arising from the Claim being first made during Policy 1.  A copy of the January 11, 2013 letter is attached as **Exhibit M**.

92.     As the parties exchanged coverage correspondence, Alix agreed to settle with Kingsbridge for €13,750,000.

93.     On January 30, 2013, Illinois National agreed to fund the settlement subject to its reservation of rights.  These rights included Illinois National's right to recoup funds that were not covered under the policies.  A copy of Illinois National's letter is attached as **Exhibit N**.

94.     In February 2013, Illinois National paid the remainder of its policy limits ($18,507,861.92) to fund the settlement subject to a reservation of rights.

## ILLINOIS NATIONAL IS ENTITLED TO RECOUP THE UNCOVERED FUNDS

95.     As discussed above, Alix received the Claim during a prior policy period but did not report the Claim to Illinois National until it had negotiated for additional, and more favorable, coverage.

96.     Illinois National reserved its right to determine whether the claim was first made during Policy 2 and repeatedly requested a November 14, 2008 letter from Kingsbridge's counsel, and any other communications which would shed light on the timing of when the Claim was first made.

97.     Once it received the letter and conducted follow-up investigation, including its discovery of the March 7, 2008 Letter, Illinois National determined that the Claim was first made during the period for Policy 1.

200653475.1 46221/173629

98.     Even if the Claim was not first made during Policy 1 (which it was), it was alternatively made during Policy 2 and before the Extended Reporting Period for Policy 2. Under either theory, Alix is not entitled to coverage for the Claim first reported to Illinois National on August 14, 2009.

99.     In the alternative, Illinois National asks the Court to reform Policy 2 to reflect the intent of Illinois National. Even though Alix was aware of Kingsbridge's demands since at least December 19, 2007, Alix never disclosed the verbal demands to Illinois National. Further, Alix never disclosed the written demand in the March 7, 2008 Letter to Illinois National. Instead, it negotiated a renewal with unclean hands and obtained favorable modifications to Policy 2. Due to Alix's non-disclosure, Illinois National eliminated or modified exclusions that would have barred the Claim. Accordingly, equity requires that the Court reform Policy 2 to remove the amendment to the Securities Exclusion and reinstate the Investment Exclusion. This reformation would bar coverage for the Claim.

100.     Accordingly, Illinois National is entitled to recoup the $18,507,861.92 in settlement funds as well as the $592,138.08 it advanced in defense expenses on behalf of Alix under Policy 2, plus interest from the date of each payment.

## COUNT I
## DECLARATORY JUDGMENT
## THAT CLAIM WAS FIRST MADE BEFORE POLICY 2

101.     Illinois National repeats and realleges the allegations contained in the paragraphs above as if set forth fully herein.

102.     Illinois National has performed all conditions required on its part by Policy 2.

103.     Illinois National advanced $592,138.08 in defense expenses for the Kingsbridge Arbitration.

17

104.   Illinois National also advanced its remaining policy limits — $18,507,861.92 — in settlement funds to Alix for the Arbitration.

105.   Policy 2 is a "claims made" policy that covers "damages resulting from a claim first made against [Alix] and reported to [Illinois National] during the Policy Period or Extended Reporting Period…for [Alix's alleged] wrongful act in rendering or failing to render professional services for others."

106.   A Claim is defined in Policy 2 as "a written demand for money or services, including a suit, arising from your wrongful act." (Bolding omitted).

107.   The Claim was first made on March 7, 2008 but was not reported until August 14, 2009.

108.   Therefore, the Claim was first made during the policy period for Policy 1 but was not reported during the policy period for Policy 1.  The Claim was reported during the Extended Reporting Period for Policy 2 but was not a claim first made during the Extended Reporting Period for Policy 2.

109.   Accordingly, Illinois National seeks a judicial determination by this Court that Alix is required to repay the defense expenses and settlement funds in the amount of $19,100,000 that Illinois National advanced to it for the Arbitration, plus interest from the date of each payment.

110.   Unless the respective rights of Kingsbridge and Illinois National are declared by this Court, Illinois National will be deprived of its right to recoupment and Kingsbridge will be permitted to retain funds to which it is not entitled.

111.   Illinois National has no adequate remedy at law.

## COUNT II – DECLARATORY JUDGMENT
## THAT CLAIM WAS FIRST MADE BEFORE
## AUTOMATIC EXTENDED REPORTING PERIOD FOR POLICY 2

112.     Illinois National repeats and realleges the allegations contained in the paragraphs above as if set forth fully herein.

113.     Illinois National has performed all conditions required on its part by Policy 2.

114.     Illinois National advanced $592,138.08 in defense expenses for the Kingsbridge Arbitration.

115.     Illinois National also advanced its remaining policy limits — $18,507,861.92 — in settlement funds to Alix for the Kingsbridge Arbitration.

116.     Policy 2 is a "claims made" policy that covers "damages resulting from a claim first made against [Alix] and reported to [Illinois National] during the Policy Period or Extended Reporting Period (if applicable)…for [Alix's alleged] wrongful act in rendering or failing to render professional services for others."

117.     Policy 2 expired on June 30, 2009.

118.     The sixty-day Extended Reporting Period for Policy 2 only applied to "claims first made against [Alix] during the Automatic Extended Reporting Period for any wrongful act occurring prior to the end of the policy period and otherwise covered by this policy."   *See* Exhibit F at Endorsement #9 (emphasis omitted).

119.     Even if the Claim was not made during Policy 1, as Illinois National asserts, it was made during the policy period for Policy 2, and no later than on the date of the March 2, 2009 Spiegel Online article.

19

120.     Upon information and belief, Kingsbridge made the Claim against Alix during Policy 2 but before the Extended Reporting Period.

121.     The Claim was reported during the Extended Reporting Period for Policy 2 but was not a claim first made against Alix during the Extended Reporting Period for Policy 2.

122.     Accordingly, Illinois National seeks a judicial determination by this Court that Alix is required to repay the $19,100,000 in defense expenses and settlement funds that Illinois National advanced to it for the Arbitration, plus interest from the date of each payment.

123.     Unless the respective rights of Kingsbridge and Illinois National are declared by this Court, Illinois National will be deprived of its right to recoupment and Kingsbridge will be permitted to retain funds to which it is not entitled.

124.     Illinois National has no adequate remedy at law.

### COUNT III – REFORMATION

125.     Illinois National repeats and realleges the allegations contained in the paragraphs above as if set forth fully herein.

126.     As alternative relief to the relief requested in Counts I and II, Illinois National seeks to reform Policy 2.

127.     Kingsbridge first made verbal demands against Alix as early as December 19, 2007.  Kingsbridge memorialized this demand in writing on March 7, 2008.

128.     The negotiations regarding the dispute between Alix and Kingsbridge continued, as was reported in the German press.

129.     Alix did not disclose the existence of the dispute at any point during the application, issuance and amendment of Policy 2.  Indeed, the dispute was not disclosed to Illinois National until the submission of the Draft Complaint more than a year later.

130.    Illinois National and Alix executed Policy 2.

131.    Policy 2 did not contain the "Investment Advisor Exclusion Endorsement" that had been included in Policy 1.  This exclusion would have barred coverage for the Arbitration.

132.    Alix also failed to disclose any aspect of the dispute with Kingsbridge while seeking—and obtaining—a May 2008 amendment to the Securities Exclusion that enabled coverage for the Arbitration.

133.    Alix had unclean hands when it requested the modifications in coverage for Policy 2 in light of its knowledge of the dispute with Kingsbridge and its withholding of that information from Illinois National.

134.    Policy 2 fails to reflect the true intent of Illinois National in that it does not account for the pre-existing dispute with Kingsbridge.

135.    The above-described failure of Policy 2 to reflect Illinois National's true intent resulted from Alix's material omissions and inequitable conduct in failing to disclose the existence of its dispute with Kingsbridge.

136.    Without knowledge of the true facts and in reliance on Alix's representations, Illinois National was misled into signing writings that it would not have signed had it known the true facts. These writings include both Policy 2 (as originally issued) and the amended Securities Exclusion.

137.    If the true facts had been known to Illinois National, it would not have agreed to modify and/or remove several exclusions without specifically excluding Alix's dispute with Kingsbridge.

138.    Illinois National is entitled to a judgment declaring that Policy 2 is reformed to include all of the exclusions contained in Policy 1, and thus to exclude the Claim.

WHEREFORE, Illinois National requests Judgment in its favor and against Alix as follows:

(1)     A declaration that Alix is not entitled to coverage under Policy 1 or Policy 2 for any claim based on its dispute with Kingsbridge, including the arbitration of said dispute, and that Illinois National is entitled to recoup, and Alix is required to repay the $19,100,000 in defense expenses and settlement funds that Illinois National advanced to it, plus interest, as the Claim was first made during Policy 1 but not reported under Policy 1; or, in the alternative:

(2) a declaration that Alix is not entitled to coverage under Policy 1 or Policy 2 for any claim based on its dispute with Kingsbridge, including the arbitration of said dispute, and that Illinois National is entitled to recoup, and Alix is required to repay the $19,100,000 in defense expenses and settlement funds that Illinois National advanced to it, plus interest, as the Claim was made during Policy 2 before the Extended Reporting Period but was not reported until the Extended Reporting Period; or, in the alternative:

(3)     a judgment declaring that Policy 2 is reformed to include all exclusions from Policy 1 and to exclude the Arbitration from coverage, and ordering Alix to repay the $19,100,000 advanced by Illinois National, plus interest; and

(4)     For such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

CLARK HILL PLC

By:    */s/ James E. Brenner*
          James E. Brenner (P11178)
          500 Woodward Avenue, Suite 3500
          Detroit, MI  48226
          (313) 965-8300

          and

          CARLTON FIELDS JORDEN BURT, P.A.
          Steven J. Brodie (PFBN 333069)
          100 Southeast Second Street, Suite 4200
          Miami, FL 33131
          (305) 530-0050

Date: April 29, 2014          Attorneys for Plaintiff Illinois National
          Insurance Company

200653475.1 46221/173629